# <u>EXHIBIT A</u>

**BURSOR & FISHER, P.A.**
L. Timothy Fisher (SBN 191626)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-Mail: ltfisher@bursor.com

*Attorneys for Plaintiff*

Electronically FILED by
Superior Court of California,
County of Los Angeles
8/22/2023 3:39 PM
David W. Slayton,
Executive Officer/Clerk of Court,
By J. Nunez, Deputy Clerk

## SUPERIOR COURT OF CALIFORNIA

## FOR THE COUNTY OF LOS ANGELES

| | |
|---|---|
| DEVON WALLMAN, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>SHEIN DISTRIBUTION CORPORATION,<br><br>Defendant. | Case No. 23STCV20136<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Devon Wallman ("Plaintiff") brings this action on behalf of herself and all others similarly situated against Defendant SHEIN Distribution Corporation ("Shein" or "Defendant"). Plaintiff makes the following allegations pursuant to the investigation of her counsel and based upon information and belief, except as to the allegations specifically pertaining to themselves, which are based on personal knowledge.

## NATURE OF THE ACTION

1.     This is a class action arising from Defendant's failure to safeguard the account and credit card information of customers to Romwe.com (the "Website").

2.     In June 2018, Defendant was targeted in a cyberattack.  On or about July 18, 2018, Defendant's payment processor alerted Defendant that the retailer's systems appeared to have been compromised.  The payment processor reported that it had been contacted by a large credit card network and a credit card issuing bank, each of which had information indicating that Defendant's systems have been infiltrated and card data stolen.  The credit card network had found some of Defendant's customers' credit card numbers from Shein.com for sale on an internet forum known for frequenting in stolen payment card data.  In addition, customers' usernames and passwords were exposed in the data breach.

3.     However, on June 12, 2020, Defendant discovered that the login credentials for 7.3 million customers of Romwe.com were also compromised in the data breach, including Plaintiff's. Thus, Defendant recklessly or negligently failed to discover that the data breach affected Website customers for roughly two years.  And, exacerbating this delay, Defendant waited six months— until December 30, 2020—to begin notifying affected customers.

4.     Further cementing this harm, Defendant *requires* users to create an account to make a purchase on the Website, and *requires* customers to use their phone number or e-mail address as a username:

1
2
3
4
5
6
7
8
9
10
11
12



13
14
15
16
17
18
19
20
21
22
23
24
25
26



27          5.      Thus, as a product of the way the Website functions, login credentials the data

28    breach exposed were necessarily customers' e-mail addresses or phone numbers.

6.      As discussed in more detail below, Defendant failed to employ reasonable and customary safeguards to protect Plaintiff's and Class Members' login credentials.  Had Defendant disclosed that it did not employ reasonable safeguards to protect login credentials, Plaintiff and Class Members would not have purchased items from the Website, or would have paid significantly less for the items than they did.

7.      Plaintiff brings this action on behalf of herself and all others similarly situated for actual damages and punitive damages to fully redress the widespread harm Defendant's wrongful acts and omissions have unleashed.

## THE PARTIES

8.      Plaintiff Devon Wallman is a citizen of New Jersey who resides in Tenafly, New Jersey.  On or about March 5, 2017, Plaintiff created an account on the Website and purchased several items of clothing on the Website: a Ribbed Knit Crop Cami Top, Black Metal Trim Cat Eye Sunglasses, a White Basic Cotton Baseball Hat, and Blue and White Triangle Bikini Set.  Plaintiff paid $30.10 in total for these four items.  Plaintiff was also required to create an account in order to make her purchases, with her login credentials consisting of her e-mail address and a password for her Website account.  Thus, the creation of Plaintiff's account was a necessary element of her purchases from the Website.

9.      Prior to making her purchases, Plaintiff reviewed the item descriptions and characteristics for each piece of clothing.  Nowhere on the product pages did Defendant disclose it would not maintain Plaintiff's login credentials using reasonable and customary data security practices.  Had Defendant disclosed that it would not maintain Plaintiff's login credentials using reasonable and customary data security practices, Plaintiff would not have purchased clothing from the Website, or would not have paid as much as she did for the items.  Thus, Defendant's omissions were a part of the benefit of the bargain with Plaintiff in that Plaintiff relied on Defendant's omissions in purchasing her clothing from the Website.  In or about January 2021, Plaintiff was first notified that her login credentials were disclosed in the data breach.  Plaintiff was not and could not have been aware that her login credentials were exposed in the data breach prior to this date.

10.     Defendant SHEIN Distribution Corporation is a Delaware corporation with a principal place of business at 757 South Alameda Street, Suite 340, Los Angeles, California 90021. Defendant owns and operates the Website.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over this class action.  This Court has personal jurisdiction over the parties because Plaintiff submits to the jurisdiction of the Court, and because Defendant, at all times relevant hereto, has systematically and continually conducted, and continues to conduct, business in this State.  Defendant's headquarters is also located in this State.

12.     This Court is the proper venue for this action under the California Code of Civil Procedure § 395.5 because Defendant resides in this county and because a substantial part of the events, omissions, and acts giving rise to the claims herein occurred in this county.

## FACTUAL ALLEGATIONS

I.      **BACKGROUND ON DATA BREACHES**

13.     A data breach is an incident in which sensitive, protected, or confidential data has potentially been viewed, stolen, or used by an individual unauthorized to do so.[1]

14.     Data breaches are becoming increasingly more common and harmful.  In 2014, 783 data breaches were reported, with at least 85.61 million total records exposed.  In 2019, 3,800 data breaches were reported, with at least 4.1 billion total records exposed.  The average cost of a data breach in the United States in 2019 was $8.19 million.[2]

15.     Consumers are harmed in a variety of ways by data breaches.  First, consumers are harmed financially.  According to the IBM and Ponemon Institute's 2019 "Cost of a Data Breach" report, the average cost of a data breach per consumer was $150 per record.[3]  However, other estimates have placed the costs even higher.  The 2013 Norton Report estimated that the average

---

[1] Julian De Groot, *The History of Data Breaches*, DIGITAL GUARDIAN (Oct. 24, 2019), https://digitalguardian.com/blog/history-data-breaches.

[2] Chris Brook, *What's the Cost of a Data Breach in 2019*, DIGITAL GUARDIAN (July 30, 2019), *https*://digitalguardian.com/blog/whats-cost-data-breach-2019.

[3] *Id*.

cost per victim of identity theft—a common result of data breaches—was $298 dollars.[4]  And in 2019, Javelin Strategy & Research compiled consumer complaints from the U.S. Federal Trade Commission ("FTC") and indicated that the median out-of-pocket cost to consumers for identity theft was $375.[5]

16.     The harm of data breaches extends to data breaches involving e-mail addresses and phone numbers.  As to e-mail addresses, "[if]f a hacker has your email address, he has half of your confidential information – all that's remaining is your password.  And they can gain that by sending you a phishing email saying that your account has been accessed from a new device or compromised."[6]  In addition, hackers can use e-mail addresses to run "social engineering attacks," which "use psychology to create a sense of fear or excitement to steal your identity or commit fraud," or to commit blackmail.[7]  For these reasons, among others, the California Legislature granted consumers a private right of action when their "email address in combination with a password" is disclosed in a data breach.  Cal. Civ. Code § 1798.150(a)(1).

17.     As to phone numbers, hackers can use this data to reroute text messages and calls to the hacker's phone, send text and call scams and malware to the victim, dox victims—which is the practice of divulging someone's private information to the public—and blackmail victims.[8]

18.     Acquisition of this data is particularly problematic when hackers also acquire user passwords.  A 2019 study by Google fold that "13 percent of people reuse the same password across all accounts, and a further 52 percent use the same one for multiple (but not all) online accounts."[9]

---

[4] NORTON BY SYMANTEC, 2013 NORTON REPORT 8 (2013), https://yle.fi/tvuutiset/uutiset/upics/liitetiedostot/norton_raportti.pdf.

[5] *Facts + Statistics: Identity Theft and Cybercrime*, INSURANCE INFORMATION INSTITUTE, https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-cybercrime (last accessed Feb. 25, 2020) (citing the Javelin report).

[6] Kristin Austin, *What Happens if a Scammer has Your Email Address?*, IDENTITYIQ (Oct. 9, 2022), https://www.identityiq.com/education/what-happens-if-a-scammer-has-your-email-address/.

[7] J.R. Tietsort, *10 Ways Scammers Hack You With Your Email Address*, AURA (Dec. 8, 2022), https://www.aura.com/learn/what-to-do-if-a-scammer-has-your-email-address.

[8] Gaetano DiNardi, *Can Someone Hack Your Phone With Just Your Number?*, AURA (May 30, 2023), https://www.aura.com/learn/what-can-hackers-do-with-your-phone-number.

[9] Aimee O'Driscoll, *25+ Password Statistics (That May Change Your Password Habits)*, COMPARITECH (Mar. 24, 2023), https://www.comparitech.com/blog/information-security/password-statistics/.

Thus, the acquisition of a consumer's e-mail address and/or phone number in addition to a password may provide hackers with access to multiple user accounts.

19.     Consumers are also harmed by the time they spend rectifying the effects of a data breach.  A Presidential identity theft report from 2007 states that:

> In addition to out-of-pocket expenses that can reach thousands of dollars for the victims of new account identity theft, and the emotional toll identity theft can take, some victims have to spend what can be a considerable amount of time to repair the damage caused by the identity thieves. Victims of new account identity theft, for example, must correct fraudulent information in her credit reports and monitor her reports for future inaccuracies, close existing bank accounts, open new ones, and dispute charges with individual creditors.[10]

20.     Further, the effects of a data breach on consumers are not temporary.  In a report issued by the U.S. Government Accountability Office ("GAO"), the GAO found that "stolen data may be held for up to a year or more before being used to commit identity theft," and "fraudulent use of [stolen information] may continue for years" after the stolen information is posted on the Internet.[11]  In fact, consumers suffer 33% of the harm from a data breach after the first year.[12]  Thus, consumers can lose *years'* worth of time dealing with a data breach.

21.     The existence of these problems is not always immediately ascertainable.  As the GAO Report describes:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft.  Further, once stolen, data has been sold or posted on the web, fraudulent use of that information may continue for years.  As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.

---

[10] U.S. FEDERAL TRADE COMMISSION, THE PRESIDENT'S IDENTITY THEFT TASK FORCE, COMBATING IDENTITY THEFT: A STRATEGIC PLAN 11 (2007), https://www.ftc.gov/sites/default/files/documents/reports/combating-identity-theft-strategic-plan/strategicplan.pdf (last accessed Feb. 25, 2020).

[11] *Remijas v. Neiman Marcus Group, LLC*, 794 F.3d 688, 694 (7th Cir. 2015) (citing U.S. GOV'T ACCOUNTABILITY OFFICE, GAO–07–737, REPORT TO CONGRESSIONAL REQUESTERS: PERSONAL INFORMATION (2007)).

[12] Larry Ponemon, *What's New in the 2019 Cost of a Data Breach Report*, SECURITY INTELLIGENCE, https://securityintelligence.com/posts/whats-new-in-the-2019-cost-of-a-data-breach-report/ (last accessed Feb. 25, 2020).

---

22.     Consumers are also harmed by the lost value of their data.  For instance, a study by the Database Marketing Institute found that the value of an e-mail address is $19.36 to marketers, while the same article found that phone numbers could be worth over $100 to the same.[13]  This information thus "has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets."[14]

23.     As a result, companies have begun providing an opportunity to consumers to sell this information to advertisers and other third parties.  More and more, consumers have control over who ultimately receives their personal information, and when consulted, consumers place a high value on their personal information as well as on the privacy of that information.

24.     Thus, when consumers' personal information like e-mail addresses and phone numbers is disclosed without their consent, consumers are deprived of both the ability to choose what is done with their information and an invasion of their privacy, as well as the full monetary value of their information.

25.     Further, researchers have confirmed:

> [w]hen privacy information is made available, consumers tend to purchase from online retailers who better protect their privacy.  In fact … when privacy information is made more salient and accessible, some consumers are willing to pay a premium to purchase from privacy protective websites.[15]

26.     In other words, consumers will pay *more money* if they are told a website will adequately protect their personal information, and will pay *less money* if they are told a website will not do so.

---

[13] https://www.avidmobile.com/blog/mobile-number-worth-sms-marketing.php.

[14] Soma, *Corporate Privacy Trend*.

[15] Janice Y. Tsai et al., *The Effect of Online Privacy Information on Purchasing Behavior: An Experimental Study*, 22 INFORMATION SYSTEMS RESEARCH 254, 254 (2011), https://www.jstor.org/stable/23015560?seq=1#page_scan_tab_contents.

## II.    THE DATA BREACH

27.    Defendant is a fast fashion retailer founded in 2008.  "Fast fashion is a business model based on replicating high-end catwalk designs and celebrity looks by mass producing them (cheap and fast) to take advantage of the latest fashion trends."[16]

28.    Defendant owns and operates several websites including Romwe.com, which sells both men's and women's clothing.

29.    As alleged above, in order to make a purchase on the Website, a consumer is required to create a Website account.  A consumer can use e-mail address, mobile phone number, Google account, or Facebook account to create an account, but some form of personal data must be used to create an account.  Further, because Google and Facebook accounts involve a consumer's e-mail address (and potentially phone numbers), a consumer is necessarily providing at least their e-mail address to Defendant even if they select one of these two options.

30.    When consumers make purchases on the Website, Defendant does not disclose that it fails to reasonably and adequately protect consumer data, including consumers' e-mail addresses, phone numbers, and passwords.  Yet, at least prior to 2018 if not thereafter, Defendant failed to maintain reasonable and adequate data security practices, including but not limited to:

(a)  **Password Management:** Until August 2018, Defendant hashed customer passwords using the MD-5 algorithm and a two-digit salt, even though it was known at the time that this method was insufficient to protect against password cracking attacks (which is an attack that involves hackers attempting to figure out what a password is).[17]

(b)  **Monitoring:** At that time, Defendant did not run regular external vulnerability scans, use file integrity monitoring to detect unauthorized modifications to critical system files, retain an audit trail

---

[16] Katherine Saxon, *What is Fast Fashion?  Definitions, Problems, and Examples*, THE VOU (July 11, 2023), https://thevou.com/fashion/fast-fashion/.

[17] *See, e.g.*, SOFTWARE ENGINEERING INSTITUTE, MD5 VULNERABLE TO COLLISION ATTACKS (Jan. 21, 2009), https://www.kb.cert.org/vuls/id/836068 ("Software developers, Certification Authorities, website owners, and users should avoid using the MD5 algorithm in any capacity.  As previous research has demonstrated, it should be considered cryptographically broken and unsuitable for further use."); SILENT SIGNAL, POISONOUS MD5 – WOLVES AMONG THE SHEEP (June 10, 2015), https://blog.silentsignal.eu/2015/06/10/poisonous-md5-wolves-among-the-sheep/ ("MD5 is known to be broken for more than a decade now.").

of a variety of systems, or regularly monitor or review audit logs to identify security incidents.

    (c)  **Incident Response:** Defendant did not have a comprehensive, written incident response plan.  In addition, following the 2018 data breach, Defendant failed to take timely action to protect many of the impacted customers, such as by alerting customers that their login credentials had been stolen and resetting the passwords of impacted accounts.

31.    In June 2018, Defendant was targeted in a cyberattack.  On or about July 18, 2018, Defendant's payment processor alerted Defendant that the retailer's systems appeared to have been compromised.  The payment processor reported that it had been contacted by a large credit card network and a credit card issuing bank, each of which had information indicating that Defendant's systems have been infiltrated and card data stolen.  The credit card network had found some of Defendant's customers' credit card numbers from Shein.com for sale on an internet forum known for frequenting in stolen payment card data.  In addition, customers' usernames and passwords were exposed in the data breach.

32.    At the time of the data breach, Defendant believed the data breach only affected its main website, Shein.com.  However, on June 12, 2020, Defendant discovered that the Website was also affected by the data breach.

33.    Specifically, Defendant discovered that 7.3 million customer login credentials for the Website—which, as alleged above, necessarily consisted of customers e-mail addresses or phone numbers, in addition to the password for the customer's Website account—were available on the dark web, in plain text and unredacted.  Defendant determined that, although the passwords were "hashed" at the time of the data breach, they were in plain text because they had been "cracked."  And, as alleged above, Defendant knew or should have known its hashing algorithm was susceptible to cracking.

34.    Defendant did not inform customers that their login credentials had been exposed in the data breach and that their passwords had been reset as a result.  Instead, between June 2020 and September 2020, Defendant simply prompted Website customers who attempted to login to their account to change their password.

35.     Defendant waited until December 30, 2020—*six months* after it first discovered the data breach affected the Website, and *over two years* after the data breach occurred—to begin notifying customers, including Plaintiff.[18]  Defendant offered no monetary compensation to customers who were affected by the data breach.

36.     Notably, the New York Attorney General has fined Defendant $1.9 million for its conduct leading to the data breach.

37.     The statute of limitations has been tolled for all claims referenced herein.  Even Defendant did not discover that personal information from the Website had been disclosed in the data breach until June 2020, and consumers were not notified of the same until December 30, 2020. Further, consumers could not and did not know that their personal information was disclosed in the data breach prior to December 30, 2020 because Defendant did not warn consumers of the same. Accordingly, the statute of limitations has been tolled until December 30, 2020.

38.     Plaintiff brings this action on behalf of herself and the Class for actual damages and punitive damages for (i) fraud, (ii) unjust enrichment, and (iii) violation of the New Jersey Consumer Fraud Act, N.J. Stat. §§ 56:8-1, *et seq.*

## CLASS ACTION ALLEGATIONS

39.     Plaintiff seeks to represent a class defined as all persons in the United States whose login credentials was maintained on Defendant's servers and were compromised as a result of the data breach (the "Class").  Excluded from the Class are Defendant, its affiliates, employees other than those affected by the data breach, officers and directors, and the Judge(s) assigned to this case.

40.     Plaintiff also seeks to represent a subclass defined as all persons in New Jersey whose login credentials was maintained on Defendant's servers and were compromised as a result of the data breach (the "Subclass").

41.     The Class and Subclass shall collectively be referred to as the "Classes."

---

[18] https://m.romwe.com/us/DataSecurityIncident-a-1038.html.

42.     Subject to additional information obtained through further investigation and discovery, the above-described Classes may be modified or narrowed as appropriate, including through the use of multi-state subclasses.

43.     **Numerosity.**  As alleged above, there are as many as 7.3 million members of the Class.  Accordingly, the members of the Class are so numerous that joinder of all members is impracticable.  Further, at this time, Plaintiff does not know the exact number of members of the Subclass.  However, given the nature of the claims and the size of Defendant's business, Plaintiff believes that the members of the Subclass are so numerous that joinder of all members is impracticable

44.     Common questions of law and fact exist as to all members of the Classes.  The data breach was generally applicable to all members of the Classes and arose from a common set of acts and omissions by Defendant without regard to the nature or identity of individual members of the Classes, thereby making appropriate relief with respect to the Classes as a whole.

45.     The questions of law and fact common to the Classes include:

(a)     Whether Defendant knew or reasonably should have known of the vulnerabilities in its systems that allowed for the unauthorized access;

(b)     Whether Defendant failed to disclose its unreasonable and inadequate data security practices to Plaintiff and members of the Classes;

(c)     Whether Plaintiff and members of the Classes paid a price premium based on Defendant's failure to disclose its unreasonable and inadequate data security practices; and

(d)     The appropriate class-wide measure of damages for the Classes.

46.     Plaintiff's claims are typical of the claims of the members of the Classes, and Plaintiff will fairly and adequately protect the interests of the Classes.  Plaintiff and all members of the Class are similarly affected by Defendant's wrongful conduct in that their login credentials have been exposed to criminal third parties without their authorization.

47.     Plaintiff's claims arise out of the same common course of conduct giving rise to the claims of the other members of the Class.

48.     Plaintiff's interests are coincident with, and not antagonistic to, those of the other members of the Class.

49.     Plaintiff is represented by counsel competent and experienced in the prosecution of consumer class actions.

50.     The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

51.     Class action treatment is a superior method for the fair and efficient adjudication of the controversy.  Among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort, and expense of numerous individual actions.  The benefits of proceeding as a class, including providing injured persons or entities with a method for obtaining redress for claims that might not be practicable to pursue individually, substantially outweigh any potential difficulties in managing this class action.

52.     The prosecution of separate actions by individual members of the Classes is not feasible and would create a risk of inconsistent or varying adjudications.

## CAUSES OF ACTION

### COUNT I
### Fraud

53.     Plaintiff incorporates by reference the allegations in the preceding paragraphs as if fully set forth herein.

54.     Plaintiff brings this claim on behalf of herself and all members of the proposed Classes against Defendant.

55.     This claim is brought pursuant to the laws of the State of California.

56.     Defendant committed fraud by omission by failing to disclose it inadequately and unreasonably protected login credentials, which led to the data breach.

57.     Defendant had a duty to disclose material facts to Plaintiff and the Classes given their relationship as contracting parties and consumers of the Website.  Defendant also had a duty

to disclose material facts to Plaintiff and the Classes because Defendant had superior knowledge such that the transactions without the disclosure were rendered inherently unfair.

58.     Defendant knew or should have known that its data security practices were unreasonable and inadequate but failed to disclose or improve the same nonetheless.

59.     Defendant failed to discharge its duty to disclose these material facts.

60.     In so failing to disclose these material facts to Plaintiff and the Classes, Defendant intended to hide from Plaintiff and the Classes that they were supplying personal information in order to make purchases, but that said personal information would not be adequately protected, and thus acted with scienter and/or an intent to defraud.

61.     Plaintiff and the Classes reasonably relied on Bayer's failure to disclose insofar as they would not have purchased the clothing from the Website or would have paid less for the clothing than they did had Defendant disclosed its inadequate and unreasonable data security practices.

62.     As a direct and proximate cause of Defendant's fraudulent concealment, Plaintiff and the Classes suffered damages in the amount of monies paid for items purchased on the Website.

63.     As a result of Defendant's willful and malicious conduct, punitive damages are warranted.

**COUNT II**
**Unjust Enrichment**

64.     Plaintiff incorporates by reference the allegations in the preceding paragraphs as if fully set forth herein.

65.     Plaintiff brings this claim on behalf of herself and all members of the proposed Classes against Defendant.

66.     This claim is brought pursuant to the laws of the State of California.

67.     Plaintiff and the Classes conferred a benefit on Defendant in the form of monies paid to purchase products from Defendant's Website, which necessarily required Plaintiff and the Classes to provide personal information that Defendant inadequately protected.

68.     Defendant voluntarily accepted and retained this benefit.

69.     Because this benefit was obtained unlawfully, namely by receiving personal information and failing to adequately and reasonably protect the same, which led to the data breach, it would be unjust and inequitable for Defendant to retain the benefit without paying the value thereof.

**COUNT III**
**Violation of the New Jersey Consumer Fraud Act,**
**N.J. Stat. §§ 56:8-1, *et seq.***

70.     Plaintiff incorporates by reference the allegations in the preceding paragraphs as if fully set forth herein.

71.     Plaintiff brings this claim on behalf of herself and all members of the proposed Subclass against Defendant.

72.     The New Jersey Consumer Fraud Act, N.J. Stat. §§ 56:8-1, *et seq.* ("NJCFA") prohibits any "act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise." *See* N.J. Stat. § 56:8-2.

73.     At all relevant times, Plaintiff, members of the Subclass, and Defendant were "persons" within the meaning of the NJCFA. *See* N.J. Stat. § 56:8-1(d).

74.     Defendant willfully and purposefully engaged in deceptive and unfair acts and practices, misrepresentation, and the concealment, suppression, and omission of material facts they intended others to rely upon in connection with the sale of the merchandise, as defined by N.J. Stat. § 56:8-1(c) and in violation of N.J. Stat. § 56:8-2, as described in the allegations above.

75.     Defendant's omissions in the sale of clothing on its Website as detailed above were acts or practices in the conduct of trade or commerce.

76.     Practices and omissions in the sale of clothing on its Website detailed above impact the public interest.

77.     Defendant's omissions in the sale of clothing on its Website as detailed above were unfair because they inequitably enriched Defendant at the expense of Plaintiff and members of the Subclass.

78.     Defendant's omissions in the sale of clothing on its Website detailed above were unfair because they offended public policy, and were so oppressive that Plaintiff and members of the Subclass had little alternative but to submit, which caused consumers substantial injury.

79.     Defendant's omissions in the sale of clothing on its Website were unfair in that they violated the well-established public policies of protecting consumers' personal information from being exposed in a data breach, which exposes consumers to unnecessary risks of identity theft and other harm, and causes consumers to overpay for products on account of Defendant's failure to disclose its inadequate data security practices.

80.     Plaintiff and members of the Classes have suffered ascertainable loss as a direct and proximate result of Defendant's conduct because (i) Plaintiff and members of the Subclass paid more for clothing on the Website than they would have—or would not have purchased clothing from the Website at all—had Defendant disclosed its inadequate data security practices, and (ii) as a result of Defendant's inadequate data security practices, Plaintiff's and members of the Subclass's personal information was disclosed in the data breach.

81.     As a direct and proximate result of the foregoing acts and practices, Defendant's has received, or will receive, income, profits, and other benefits which it would not have received if it had not engaged in the violations described in this Complaint.

82.     As a result, Plaintiff and members of the Subclass seek relief including, *inter alia*, refund of amounts recovered by Defendant for clothing on its Website, damages, treble damages, attorney's fees, and costs pursuant to N.J. Stat. §§ 56:8-2.11 and 56:8-19.

**COUNT IV**
**Violation of the California Unfair Competition Law,**
**CA Bus. & Prof. Code § 17200, *et seq.***

83.     Plaintiff incorporates by reference the allegations in the preceding paragraphs as if fully set forth herein.

84.     Plaintiff brings this claim on behalf of herself and all members of the proposed Classes against Defendant.

85.     Defendant has violated Business and Professions Code §17200, *et seq.* with respect to Plaintiff's and Class members' collecting personal information by engaging in unlawful, unfair or fraudulent business acts and omissions that constitute "unfair competition" as defined in Cal. Bus. Prof. Code § 17200.  Defendant's malfeasance and misfeasance violated established public policy. It is the established public policy of this state that confidential information entrusted to online retailers, such as Defendant, be adequately protected from outside intrusions. This public policy is expressed throughout state and federal laws, such as 15. U.S.C. § 45, Civil Code § 1798.81.5, and Cal. Const. Art I, § 1, There is no sufficient countervailing interest to support the Defendant's failure to take the necessary steps to protect Plaintiff's and Class members' confidential personal information. Defendant's actions and inactions were immoral, unethical, oppressive, unscrupulous, unconscionable and/or substantially injurious to Plaintiff and Class members in the following ways:

a)  Failing to establish adequate security practices and procedures for maintaining and storing Plaintiff's and Class members' personal information, and storing Plaintiff's and Class members' personal information in an unsecure electronic environment. These unfair acts and practices were immoral, unethical, oppressive, unscrupulous, unconscionable, and/or substantially injurious to Plaintiff and Class members. Defendant's practices were contrary to legislatively declared and public policies that seek to protect consumer data and ensure that entities who solicit or are entrusted with personal data utilize appropriate security measures, as reflected by laws like 15 U.S.C. § 45 and Cal. Civ. Code § 1798.81.5. The harm these practices caused to Plaintiff and Class members outweighed their utility;

b)  Collecting Plaintiff's and Class members' personal information with knowledge that the information would not be adequately protected, and storing Plaintiff's and Class members' personal and financial information in an unsecure electronic environment; and

c) Omitting, suppressing, and concealing the material fact of the inadequacy of the privacy and security protections.

86.     Plaintiff and Class members may maintain an Unfair Competition Law ("UCL") claim based on conduct declared unlawful under the FTC Act, 15 U.S.C § 45, et seq., and FTC regulations, guidance, and decisions. *See Rubenstein v. Neiman Marcus Grp. LLC*, 687 Fed. Appx. 564, 567 (9th Cir. 2017) (quoting Davis v. HSBC Bank Nev., N.A., 691 F.3d 1152, 1168 (9th Cir. 2012)) ("[A]lthough the FTC Guides do not provide a private civil right of action, "[v]irtually any state, federal or local law can serve as the predicate for an action under [the UCL.]"); *see also In re Anthem, Inc. Data Breach Litig.*, 162 F. Supp. 3d 953, 989 (N.D. Cal. 2016).

87.     "Section 5 of the FTC Act [15 U.S.C. § 45] is a statute that creates enforceable duties, and this duty is ascertainable as it relates to data breach cases based on the text of the statute and a body of precedent interpreting the statute and applying it to the data beach context." I*n re Capital One Consumer Data Sec. Breach Litig.*, 488 F. Supp. 3d 374, 407 (E.D. Va. 2020). "For example, in *F.T.C. v. Wyndham Worldwide Corp.*, 799 F.3d 236, 240 (3d Cir. 2015), the United States Court of Appeals for the Third Circuit affirmed the FTC's enforcement of Section 5 of the FTC Act in data breach cases." *Capital One Data Security Breach Litigation*, 488 F. Supp. 3d at 407; see also *id.* at 420 (finding that alleged violations of Section 5 of the FTC Act stated a claim for violation of the unlawful prong of the UCL).

88.     Plaintiff's and Class members' nonpublic personal information was and is customer information.

89.     Defendant committed unlawful acts under the UCL by failing to comply with the requirements of the Safeguards Rule, including but not limited to, failing to:

(a)     Adequately protect Plaintiff and class member's account passwords or follow industry standard password management procedures;

(b)     Run regular external vulnerability scans, use file integrity monitoring to detect unauthorized modifications to critical system files, retain an audit trail of a variety of systems, or regularly monitor or review audit logs to identify security incidents; and

(c)     Have a comprehensive, written incident response plan.  In addition, following the 2018 data breach, Defendant failed to take timely action to protect many of the impacted customers, such as by alerting customers that their login credentials had been stolen and resetting the passwords of impacted accounts.

90.     Defendant engaged in unlawful and unfair acts and practices by failing to disclose the Data Breach to Class Members in a timely manner, contrary to the duties imposed by common law, Cal. Civ. Code § 1798.82 and other state data breach notification statutes that are applicable. These unfair acts and practices were immoral, unethical, oppressive, unscrupulous, unconscionable, and/or substantially injurious to Plaintiff and Class members. The harm these practices caused to Plaintiff and Class members outweighed their utility, if any.

91.     Plaintiff and members of the Classes have suffered ascertainable loss as a direct and proximate result of Defendant's conduct because (i) Plaintiff and members of the Subclass paid more for clothing on the Website than they would have—or would not have purchased clothing from the Website at all—had Defendant disclosed its inadequate data security practices, and (ii) as a result of Defendant's inadequate data security practices, Plaintiff's and members of the Subclass's personal information was disclosed in the data breach.

92.     California has a significant interest in regulating the conduct of businesses operating within its borders. California seeks to protect the rights and interests of all California residents and citizens of the United States against a company with its principal place of business in California. California has a greater interest in the claims of Plaintiff and members of the Class than any other state, and is most intimately concerned with the claims and outcome of this litigation.

93.     The principal place of business of Defendant, located in Los Angeles, California, is the "nerve center" of its business activities – the place where its high-level officers direct, control, and coordinate the company's activities, including its data security functions and policy, financial, and legal decisions.

94.     Defendant's response to the Data Breach at issue here, and corporate decisions surrounding such response, were made from and in California.

95.     Defendant's breaches of duty to Plaintiff and Class members emanated from California.

96.     Application of California law to the Class with respect to Plaintiff's and Class members' claims is neither arbitrary nor fundamentally unfair because California has significant contacts and a significant aggregation of contacts that create a state interest in the claims of Plaintiff and the Class.

97.     Under California's choice of law principles, the common law of California applies to the common law claims of all Class members. Additionally, given California's significant interest in regulating the conduct of businesses operating within its borders, California's Unfair Competition Law may be applied to non-resident consumer Plaintiff as against this resident-defendant. Further, Defendant's Terms and Conditions include a venue provision selecting venue within state or federal courts in California.

98.     Defendant knew or should have known that its computer systems and data security practices were inadequate to safeguard Plaintiff's and Class members' personal information and that the risk of a data breach or theft was highly likely. Defendant's actions in engaging in the above-named unfair practices and deceptive acts were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of Plaintiff and members of the Class.

99.     Plaintiff and Class members seek relief under Cal. Bus. & Prof. Code § 17200, *et seq.*, including, but not limited to, restitution to Plaintiff and Class members of money or property that Defendant wrongfully acquired from Plaintiff and Class members by means of Defendant's deceptive, unlawful, and unfair business practices, declaratory relief, attorney's fees and costs (pursuant to Cal. Code Civ. Pro. § 1021.5), and injunctive or other equitable relief.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

(a)     For an order certifying the Classes under Rule 23 of the Federal Rules of Civil Procedure, naming Plaintiff as the representative of the Classes, and naming Plaintiff's attorneys as Class Counsel to represent the Classes;

(b)     For an order declaring that Defendant's conduct violates the causes of action referenced herein;

(c)     For an order finding in favor of Plaintiff and the Classes on all counts asserted herein;

(d)     For compensatory and punitive damages in amounts to be determined by the Court and/or jury;

(e)     For prejudgment interest on all amounts awarded; and

(f)     For an order awarding Plaintiff and the Classes their reasonable attorneys' fees and expenses and costs of suit.

## JURY TRIAL DEMANDED

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any and all issues in this action so triable as of right.

Dated: August 22, 2023                     Respectfully submitted,

                                            **BURSOR & FISHER, P.A.**

                                            By:_____

                                            L. Timothy Fisher (SBN 191626)
                                            1990 North California Blvd., Suite 940
                                            Walnut Creek, CA 94596
                                            Telephone: (925) 300-4455
                                            Facsimile:  (925) 407-2700
                                            E-Mail: ltfisher@bursor.com

                                            *Attorneys for Plaintiff*